**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| PORTLAND MUSIC HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF PORTLAND,<br><br>Defendant | ) | 2:26-cv-00304-JCN |

**<u>DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

Defendant City of Portland ("the City") moves to dismiss this action for failure to state a claim in each count of the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. To the extent the alternative arguments based on lack of Article III standing or ripeness, are addressed as jurisdictional threshold doctrines, this motion is also brought pursuant to Rule 12(b)(1).

Plaintiff Portland Music Holdings, LLC (hereafter "PMH") still has a pending revised land use application before the City's Planning Board which has not reached final decision. Nonetheless, despite the issues the pendency of the application raises on questions of ripeness and constitutional Article III standing, PMH nonetheless fails to state constitutional claims under the standards for pleading in federal court, requiring sufficient factual detail and non-conclusory allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020). Although referenced by the Complaint allegations, PMH did not include copies of the City Council orders it places in issue;

the City submits them here as attached Exhibits 1, 2, and 3. The grounds for this motion are more fully set forth below.

## FACTUAL AND PROCEDURAL BACKGROUND

PMH submitted a land use application on December 19, 2024, seeking site plan approval for a music venue under the City's local zoning and land use ordinance (the City's Land Use Code, Chapter 14 of the City's Code of Ordinances). The only details of the application that PMH includes in its Complaint are that the music venue would have "a capacity exceeding 1000 people" (Compl. ¶ 39), or that the proposed venue was a "large-scale theater or performance hall." Compl. ¶ 17; ECF Doc. 1 (hereafter "Compl."). The Complaint allegations leave out the specific detail that the proposed development was a 3,300-seat music venue.[1]

The City Council passed an 180-day moratorium on August 11, 2025. *See attached* **Exhibit 1**: Order 9-25/26, "Order Establishing a 180-Day Moratorium on Theater and Performance Hall Projects with a Capacity Exceeding 2000 People in the City of Portland."[2] The moratorium was retroactive to December 1, 2024, and provided that no applications "for any new theaters or performance halls with a capacity exceeding 2000 people shall be accepted, processed, reviewed, or approved by the City or the Planning Board for the period of this Moratorium." *Id*. at page 2. Thus, the City Council's moratorium order covered the PMH land use application.

---

[1] *See* https://spectrumlocalnews.com/me/maine/news/2026/04/24/portland-city-council-to-vote-on-music-venue-ordinance-change- (last visited July 16, 2026). This Court may take judicial notice of undisputed public facts on a motion to dismiss. *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 207-208 (1st Cir. 2016) (considering "press release" and "news articles" and stating "[a]fter all, even within the Rule 12(b)(6) framework, a court may consider matters of public record and facts susceptible to judicial notice").

[2] PMH does not attach copies of relevant City Council Orders referred in its Complaint. This Court may take judicial notice of them on a motion to dismiss. *See Fortuna v. Town of Winslow*, 607 F. Supp. 3d 29, 35-36 (D. Me. 2022); *FEDEQ DV004, LLC v. City of Portland*, 597 F. Supp. 3d 463, 469 (D. Me. 2022).

By order effective February 23, 2026, the City Council extended the moratorium for an additional 179 days. *See attached* **Exhibit 2**: Order 131-25/26, "Order Extending for 179 Days the Moratorium on Theater and Performance Hall Projects with a Capacity Exceeding 2000 People in the City of Portland Established by Order 9-25/26." During the moratorium period, the City amended its Land Use Code, including to increase the "buffer zone" between large performance venues from 100 feet to 750 feet. *See* City Land Use Code, Ch. 14, Art. 6.4.42 (City Council Order 182-25/26). The land use code amendment applied to large theater and performance halls, defined by occupancy of more than 1000 persons, and is also retroactive to December 1, 2024 to apply to the moratorium period. See attached **Exhibit 3**: Order 224-25/26.

The moratorium and the ensuing land use code amendments were enacted consistent with the City's municipal land use power and responsibilities under Maine law. *See* Title 30-A, Part 2, Maine Revised Statutes, including 30-A M.R.S. §§ 3001 et seq. (ordinance power), § 4352 (zoning ordinances); § 4356 (moratoria). The City Council Orders contain findings, in the form of "whereas" clauses, that undergird the public health, general welfare, and safety protections and policy considerations of each order. And the findings and conclusions include the City Council's requisite determination that amendments to the Land Use Code are consistent with the City's adopted Comprehensive Plan. Exhibit 3 at p.4 (final "Whereas" clause); 30-A M.R.S. § 4352(2) (requiring all provisions of a zoning ordinance to be both "pursuant to and consistent with a comprehensive plan adopted by the municipal legislative body").

The City Council also voted to end the moratorium as of May 27, 2026. Compl. ¶ 36. In its Complaint, PMH seems to pass over the fact that it submitted a revised land use application to the City, which remains pending. Its Complaint allegation in paragraph 42, alleging that it would be "futile for PMH to pursue the Application," implies that PMH is referring to its original

"Application" of December 19, 2024, as amended (*see* Compl. ¶ 11). The allegations are unclear on whether PMH is relinquishing the permitting process before final hearing and determination by the City Planning Board.

PMH commenced this action on June 9, 2026. ECF No. 1. The City brings this motion before answering, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. PMH seeks to raise in this action several constitutional claims under the United States Constitution: Count I, "impairment of contracts;" Count II, violation of "substantive due process;" Count III, "unlawful taking;" Count IV, violation of "procedural due process." Counts V and VI of the Complaint seek to raise counterpart claims under the Maine Constitution. For the reasons argued below, the Complaint fails to state a claim upon which relief can be granted, and fails to establish Article III standing or ripeness.

## <u>ARGUMENT</u>

### i. Standard of Review

PMH leaves many essential facts in doubt, unaddressed, or left to speculation. It then follows the factual allegations of its Complaint with conclusory assertions and legal labels in each Count, merely restating cause of action elements or conclusory legal terms. None of this complies with federal court pleading standards under *Iqbal* and *Twombly*. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *Zell*, 957 F.3d at 7.

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief, *with enough factual detail* to make the asserted claim plausible on its face." *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (cleaned up) (italics emphasis added); *see also* Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). There are two steps to evaluating a Rule 12(b)(6) motion: first, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements" and then it must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (cleaned up). "Plausible . . . means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the Court] to draw on [its] judicial experience and common sense." *Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019) (cleaned up).

The PMH pleading falls short of these standards.

**ii. PMH lacks Article III standing because without a final determination by the Planning Board, the case is not ripe.**

As noted above, there has been no Planning Board final determination on the PMH revised application. Though the City agrees with PMH that the revised application would not meet, at least, the buffer zone dispersal requirements of Article 6.4.42 of the City's Land Use Code (Compl. ¶ 42), there may be other parts of the application that do not meet other code requirements. This is a complex land use development application. Conclusions about all of its features cannot be reached without a public hearing and decision by the City's Planning Board, which has not occurred.

"Both standing and ripeness are 'interrelated' components of [the] constitutional requirement" that federal court jurisdiction be restricted to "cases" and "controversies" under U.S. Const. art. III, § 2. *NPG, LLC v. City of Portland, Maine*, No. 2:20-cv-00208-NT, 2020 WL

4741913, *3 (D. Me. 2020) (citing *Reddy v. Foster*, 845 F.3d 493, 499-500 (1st Cir. 2017)). As a Rule 12(b)(1) challenge to jurisdiction, the ripeness issue should be addressed first. *Id*.

To show Article III standing, a plaintiff must establish "(1) an injury in fact which is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) *that the injury is fairly traceable to the challenged action*, and (3) that it is likely . . . that the injury will be redressed by a favorable decision." *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (italics emphasis added). An injury is "concrete" if it is real and not abstract, *id.* (quoting *Spokeo Inc. v. Robins*, 578 U.S. 330, 339 (2016)), and it is "particularized" if it "affects the plaintiff in a personal and individual way." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, and n.1 (1992)).

"Whereas standing asks 'who' may bring a claim, ripeness concerns 'when' a claim may be brought." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 32 (1st Cir. 2007). The ripeness doctrine "seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Reddy*, 845 F.3d at 500 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (explaining that the purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements") (internal quotations omitted). In assessing whether a claim is ripe, the court evaluates "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). "Generally, both prongs must be satisfied for a claim to be ripe." *NGP, LLC,*

2020 WL 4741913 at *4 (citing *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)).

Here, because the Planning Board has not yet ruled on the pending revised application of PMH, the focus is on ripeness, as well as the interrelated concept of whether there is an injury "fairly traceable to the challenged action." *Spokeo*, 578 U.S. at 339. The Planning Board decision might rest a denial on additional criteria other than or in addition to the large-venue buffer amendment of which PMH complains. That could result in this Court adjudicating claims relating to "contingent future events that may not occur as anticipated," *Reddy*, 845 F.3d at 500, or a final land use determination that diverges from the Complaint's challenged actions of the City Council. The current Complaint is premised upon the future event that the Planning Board will deny the application based only on those aspects of the land use code that PMH implicates as self-proclaimed "Obstacles" in its pleading. Compl. ¶ 44. But we do not know, until a final Planning Board decision, if PMH is really impacted by only those "Obstacles," or whether there are other aspects of its application that would not hold water in any event.

The ripeness doctrine has particular application, as well, in the alleged takings context. *See* Compl. Count III. While the City maintains, as argued below, that a "takings" claim is not plausibly raised under the present facts, nonetheless if there has been no actual enforcement of the regulation in issue in the form of a denial of a land use application permit, it is difficult if not impossible to analyze the scope of a takings claim without engaging in speculation. Were it otherwise, then the extreme logical extension is any developer anywhere, who might have a desire to challenge this or any land use code provision in the City, can just profess to have an interest in the development in issue, without more, and confer standing on themselves without even submitting an application. The ripeness doctrine ensures that if a regulatory "taking" is

claimed, it is analyzed as a "taking" that has actually occurred, seeking relief of "just compensation" for that taking, rather than one which is hypothetical or that might not happen on the same rubric of facts in complaint allegations.

For these reasons, PMH's Complaint should be dismissed without prejudice for lack of standing and ripeness.

### iii. The "Impairment of Contracts" Allegations Fail to State a Claim

"The Contracts Clause restricts the power of States to disrupt contractual arrangements. It provides that '[n]o state shall ... pass any ... Law impairing the Obligation of Contracts.' " *Sveen v. Melin*, 584 U.S. 811, 818-19 (2018); U.S. Const. art. I, § 10. But of course, "not all laws affecting pre-existing contracts violate the Clause." *Id*. at 819 (citing *El Paso v. Simmons*, 379 U.S. 497, 506-07 (1965)). The Supreme Court's standard for determining when a law might "cross the constitutional line" is a two-stepped approach:

> The threshold issue is whether the state law has "operated as a substantial impairment of a contractual relationship." In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose."

*Id*. (citations omitted). *See also Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 383 (D. Mass. 2020) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (whether there has been a "substantial impairment" of contract triggers a three-prong inquiry: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.").

As the court emphasized in *Baptiste* – a case involving the Massachusetts moratorium on residential evictions during the COVID-19 pandemic – on the question of undermining the contractual bargain, it must be recognized that " '[a] contract depends on a regime of common and statutory law for its effectiveness and enforcement.' " *Id*. (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129-30 (1991)). "Therefore, '[l]aws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.' " *Id*. (quoting *Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 660 (1923)). " 'This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge.' " *Id.* This standard is critical to understanding why PMH fails to state a claim on the present facts.

First, however, the Court cannot begin the analysis under the impairment of contracts clause, because the identification of the "option" contract is too general. We know nothing about it or any of its inherent bargained-for terms. We do not know any of its terms and conditions, its bargains, whether it contemplated zoning approval as a condition (and if so, how, or how the condition is described), what triggers or triggered the option, or the nature of any development that may or may not be its subject. All we know about the "option" alleged was that it was to "acquire the [site]" in issue (and that it was assigned to PMH). Compl. ¶ 8. But when, on what terms and conditions, at what price? Has the option expired? Did it expire on its own terms? We literally know nothing about it from the allegations.

Secondly, presumably if the option contemplated zoning or land use approval in any of its terms, then it surely – under the "contract regime" standards above – relied on the statutory and regulatory scheme of municipal land use approval, which expressly includes a municipality's

moratoria powers in Maine under 30-A M.R.S. § 4356. All commercial developers are aware of development approval risks as part of the bargained-for terms of ground leases, options, rights of first refusal, licenses, etc. All are aware that those risks include statutory powers of moratoria, as a tool in urban planning, growth management, and zoning, which have existed for decades upon decades in Maine, especially for new, large, complex, or sui generis land use applications that raise many public policy issues and pique the public interest. How those risks were balanced or addressed in the "option" contract in issue is impossible to know, because the pleading lacks necessary details.

This lacuna in pleading leaves the claim defunct under federal pleading standards. The nature of a "substantial impairment" is unalleged, and therefore its plausibility cannot be determined. And in determining not only whether there has been a substantial impairment to a contract, it is also necessary to "consider the degree to which the Moratorium interferes with the [plaintiff's] reasonable expectations." *Baptiste*, 490 F. Supp. 3d at 384. "In this inquiry, it is especially important whether the parties operated in a regulated industry." *Id*. (quoting *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999)). "More specifically, '[t]he reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry.' " *Id.* (quoting *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020)). *See also Energy Rsrvs. Grp., Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411 (1983).

PMH was clearly operating in a heavily regulated industry when it comes to land use development applications. There are no detailed factual pleadings to explain how PMH would not reasonably expect that the law would not stay static, especially when a developer bursts on

the scene in Portland, Maine with a new inner city music venue proposal, far outsizing what exists, across the street from one of the few that is already there. The urban planning and police power issues it raises are inescapable. It would not have surprised anyone that the City set up processes to study these public policy and police power concerns, using for example the City's Housing and Economic Development and Planning staff. *See* Exhibit 2. Generally, as explained by the Supreme Court, "[t]he parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, *but they are unlikely to expect that state law will remain entirely static*. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.17 (1977) (italics emphasis added). PMH, as presumably a sophisticated developer, was "unlikely to expect that [the law would] remain entirely static" in this heavily regulated land use planning field. *Id.* In any case, there are just no allegations about what PMH's reasonable expectations were in the context of an ill-defined "substantial" impairment to a cryptic "option" in the first instance.

The impairment of contracts analysis should end there. Even then, however, the final component of the analysis that looks to "a significant and legitimate public purpose" defeats PMH's attempted pleading. The Court must ignore PMH's conclusory allegations and look to the stated purpose of the buffer/dispersal amendment itself. PMH does not challenge *the concept* of a buffer between large theaters or performance venues dispersed throughout the allowable zones in the City, as a legitimate urban planning and public safety measure. Impliedly, according to PMH, 100 feet is fine, but 750 feet is not. But PMH's conclusory label that the City's new buffer zone is "unreasonable and unnecessary to serve any legitimate important public purpose" – allegations which this Court must ignore under the federal court pleading standards – cannot be squared with

the inherent legitimacy of a buffer between venues within the City's peninsula as a valid exercise of police power.

Furthermore, the PMH Complaint ignores the City Council's express findings, made after public hearing and after consideration of "all the oral testimony, public comment, written materials, reports and other information submitted at the hearing":

> WHEREAS, based on all of the information provided, the City Council finds that dispersing theater and performance halls with an occupancy of 1,000 or more persons by 750 feet will prevent the overburdening of public infrastructure and city services and help ensure safe road conditions for pedestrians, bicycles, and vehicles; and
>
> WHEREAS, the City Council further finds that the 750-foot dispersal requirement will reduce single occupancy vehicle trips to and from the Portland peninsula, reduce parking demand and reduce motor vehicle congestion, which will create safer and more inviting streets for pedestrians and cyclists and improve the city's livability; and
>
> WHEREAS, the City Council further finds that the 750-foot dispersal requirement will help the city's emergency response services meet the needs of all residents by mitigating motor vehicle congestion that could otherwise inhibit public safety responders from reaching individuals during an emergency; and
>
> WHEREAS, the City Council further finds that the 750-foot dispersal requirement for large theaters and performance halls will also help avoid public harm to the creative economy, character, and vitality of the City's downtown region and ensure existing venues are not displaced, jobs at those venues are not lost, and the unique character of Portland's arts community and its accessibility for all residents is not eroded;

Exhibit 3 at p.4 (Order 182-25/26, second page). Furthermore, PMH's allegations about the Planning Board's alternative recommendations are immaterial, because the Portland City Council is the legislative power in issue – and the City Council made its legislative decision, under the findings above, by expressly acknowledging that these public policy issues belong with the Council. The City Council does not rubber-stamp recommendations of the unelected Planning Board. The City Council stated in its findings, further:

> WHEREAS, based on the foregoing, although the City Council respects the work done by the City's Planning Board, the City Council's findings lead to a different result in this matter, and the City Council concludes that the proposed amendments to Chapter 14, Articles 3, and 6, are consistent with the Comprehensive Plan; . . .

*Id*. The City Council decided that the land use code amendment was consistent with the City's comprehensive land use plan – a plan adopted by statutory mandate under Title 30-A. PMH fails to plead, in light of these findings, how the land use code amendment does not advance a legitimate public purpose. Mere disagreement with them does not make them invalid under the Constitution.

As for the moratorium itself, which PMH seems to lump into its self-described list of "Obstacles" (Compl. ¶ 44), all of the Moratorium findings are also express and supported. *See* Exhibits 1 and 2 "whereas" clauses. The Complaint contains no detailed factual allegations to *plausibly* state, beyond "the merely possible" (*Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019), that the moratorium did not advance a legitimate public purpose. It in fact resulted in valid, rational land use code amendments following public hearing and input, covering issues of public safety, infrastructure, economy, accessibility, etc., all contained within and explained in the City Council's findings. Exhibits 1 – 3.

On each component of a constitutional claim for "impairment of contracts," PMH fails to state a claim upon which relief can be granted.

**iv. PMH Fails to State a Claim for Violation of Substantive Due Process.**

PMH fails to state a claim for violation of substantive due process. The allegations of the Complaint in paragraphs 65-69 are conclusory recitations of the cause of action elements – a failure to plead under federal court pleading standards. *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020)

(on 12(b)(6) motion, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

"A viable substantive due process claim requires proof that the state action was '*in and of itself* . . . egregiously unacceptable, outrageous, or conscience-shocking.' " *Licari v. Ferruzzi*, 22 F.3d 344, 347 (1st Cir. 1994) (quoting in part *Amsden v. Moran,* 904 F.2d 748, 754 (1st Cir.1990) (emphasis in original), *cert. denied*, 498 U.S. 1041 (1991)). The First Circuit has been extremely reluctant to apply substantive due process to alleged violations in local land use planning and permitting cases. *See Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir.1992). "[R]ejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process." *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 31 (1st Cir.1991), *cert. dismissed*, 503 U.S. 257 (1992).

> To apply it to claims like the present [one for denial of permits for construction of waste disposal facilities and a residential facility,] would be to insinuate the oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals. Clearly, it is no simple matter to decide what abuses to regard as abuses of 'substantive' due process. Every litigant is likely to regard his own case as involving such an injustice. Thus, we have consistently held that the due process clause may not ordinarily be used to involve federal courts in the rights and wrongs of local planning disputes.

*Nestor Colon Medina*, 964 F.2d at 45. *See also Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir.1982) (quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 12 (1974) (Marshall, J., dissenting) ("Every appeal by a disappointed developer from an adverse ruling by a local [ ] planning board necessarily involves some claim that the board exceeded, abused or 'distorted' its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason.")); *see also Global Tower Assets, LLC v. Town of Rome, Me.*, No. 1:14–cv–00085–GZS, 2014 WL 3784233, *11 (D. Me. 2014) (dismissing substantive

due process claim under Rule 12(b)(6) for failure to plead more than a "run of the mill" land use dispute).

Because local and state boards are "closer to the situation," they – and not federal courts – are "better equipped to provide relief." *Id.* Thus "the threshold for establishing the requisite 'abuse of government power' is a high one indeed." *Licari*, 22 F.3d at 347. The First Circuit reserves federal relief based on substantive due process to "truly horrendous situations." *Id.* at 350; *Nestor Colon Medina*, 964 F.2d at 45. PMH must therefore establish by plausible pleading that the City's land use code amendment and the moratorium that gave the City the time and space to review and study the implicated policy issues, and receive public comment and input on them, using legitimate City processes without aberration, was "truly horrendous" such that it amounted to more than a state law violation. *See e.g., Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir.1992) ("It is bedrock law in this circuit . . . that violations of state law . . . do not, without more, give rise to a denial of substantive due process."); *PFZ Properties, Inc.*, 928 F.2d at 31; *Chiplin Enterprises, Inc. v. City of Lebanon*, 712 F.2d 1524, 1527 (1st Cir. 1983); *Roy v. City of Augusta*, 712 F.2d 1517, 1523 (1st Cir.1983); *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982), *cert. denied*, 450 U.S. 989 (1982).

Under this standard, PMH fails to plead a claim for deprivation of substantive due process. First, PMH had no vested rights in its December 2024 application, nor does it allege so. *Portland v. Fisherman's Wharf Assocs.*, 541 A.2d 160, 164 (Me.1988) (developer does not obtain vested rights simply by incurring expenses of preparing and submitting an application). This is because "all property is held in subordination to the police power." *Thomas v. Zoning Bd. of Appeals*, 381 A.2d 643, 647 (Me.1978). This matter presents a municipality's unremarkable and standard use of the moratorium power in Maine: i) a specific land use application triggers

public policy and police power issues that are not covered or anticipated by provisions of the existing land use code, or urban growth management issues that require analysis for consistency with the adopted comprehensive land use plan, and ii) those important issues have not been publicly vetted, studied, or analyzed in the local land use planning process in the context of the nature of development in issue. So, after public notice and hearing, a moratorium is passed, before a developer's rights in a given application have vested, using the legitimate exercise of moratoria powers granted to municipalities under state law (30-A M.R.S. § 4356), and the moratorium is applied retroactively consistent with Maine law under 1 M.R.S. § 302. *See also* Exhibit 1 at p.2 ("Now, Therefore" clause referencing section 302). During the moratorium period, the municipality studies the issues, holds public hearings for public review and input, and ultimately adopts amendments to its land use code, consistent with its comprehensive land use plan, flowing from that period of public input, hearing, and analysis. These facts do not reveal a substantive due process claim, no matter how much PMH is upset by them.

The Complaint itself recounts the public hearings, studies, public input, and analysis that were employed to address the policy issues. *See, e.g.*, Compl. ¶¶ 29-35. PMH acknowledges that the policy issues were debated and that there was disagreement – indeed, even disagreement between the Planning Board and the elected officials of the governing legislative body of the city, the City Council. There is nothing to shock our constitutional consciences here. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (historic decision holding that a municipal zoning ordinance would survive a substantive due process challenge so long as it was not "clearly arbitrary and unreasonable, having no *substantial relation to the public health, safety, morals, or general welfare.*"). The express findings of the City Council, and the public debates

and public hearings, studies, and reports relating to them, clearly have substantial relation to the police power. This Complaint raises no plausible claim.

PMH is unhappy with the amendment to the land use code, true, but its desire to develop a large *1000-plus person occupancy* music venue was always subject to the police power. The land use code amendment in issue does not prohibit PMH from constructing a music venue on the site in issue. It just ends up that PMH cannot propose as large a venue – one of over 1000-person occupancy – as it had originally hoped. Allegation labels that things are left "fundamentally unfair" (Compl. ¶¶ 65-66) do not raise a substantive due process violation.

**v. PMH Fails to State a Claim for Unlawful Taking**

First, any unlawful taking claim fails because it is not ripe, as argued above: the Planning Board has not made a final determination on the pending revised application, so nothing has been "taken." Second, PMH's attempt at pleading a regulatory taking fails, because we do not know what property right, with sufficient factual detail, PMH claims it has been deprived of in terms of fair market value. PMH does not own the land in issue, it alleges it owns an assignment of an option – the terms of which are unknown. Compl. ¶ 8. There is no allegation, nor could there be, that the City of Portland took the option, or that it condemned the site in issue. Third, the Supreme Court has been clear that "the common touchstone" of inquiries in the "regulatory takings jurisprudence" is that the regulatory action must be "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005) (discussing regulatory takings standards set by *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)). Thus, under *Penn Central*, the magnitude of the economic impact of the regulation must be of such a scale that it denies the owner of any economically viable use of his land, *id*. at 138,

n. 36, or that forces the owner to "sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle," *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (italics emphasis in original).

That is clearly not this case, and, again, the reciting of legal labels in the Complaint ¶¶ 72-75, does not survive a motion to dismiss.[3] The land in issue has not been rendered economically unviable. Even the buffer zone amendment would not apply to all music venues on the site, only ones defined as exceeding 1000-person occupancy. Exhibit 3.

**vi. PMH Fails to State a Claim for Deprivation of Procedural Due Process.**

Not one allegation appears to raise a procedural infirmity in the process by which the City Council made or issued the Orders on the moratorium or the land use code amendment. PMH does not allege – nor can it – that it had vested rights in the application at the time the moratorium was passed, even if (or especially because) the moratorium was enacted before the Planning Board hearing on the application. By analogy, a court case commenced one day before a statute of repose runs out, is as timely as a case commenced one year before it runs; the defendant's due process rights have not been violated merely because the case was commenced with only one day left to go, even if the defendant had built up greater reliance, hope, or investment that the case would never be commenced. Furthermore, the City Council is the elected governing legislative body of the City, and is not bound by recommendations of the Planning Board or other committees. Public hearings revealed that members of the public also disagreed with certain committee recommendations and with PMH's position on the impact its

[3] We note that the Complaint's characterization of the City Council's action as not "advancing a legitimate governmental interest" is no longer the standard in a "takings" claim. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005): "Today we correct course. We hold that the 'substantially advances' formula is not a valid takings test, and indeed conclude that it has no proper place in our takings jurisprudence."

development would have on the safety, general welfare, health and morals of the public. As such, the City Council's majority decision on the orders in issue here carried both public support and express findings relating to public health, safety, morals and general welfare. PMH's disagreements with the City's policy decisions raise neither procedural nor substantive due process violations.

**vii. Judgment against PMH on the Federal Counts I through IV Warrants Judgment on the Mirror Counts under the Maine State Constitution.**

In general, the Maine Constitution does not itself necessarily confer a private right of action against a governmental entity or state actor for damages. *Andrews v. Department of Environmental Protection*, 716 A.2d 212, 220 (Me. 1998). PMH does not allege the Maine Civil Rights Act, 5 M.R.S. §§ 4681, et seq. ["MCRA"] in either Count V or VI, but MCRA is generally the statutory vehicle for damages claims under the state constitution. Nonetheless, the state constitutional claims are coextensive with federal constitutional claims enforced under 42 U.S.C. § 1983. *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA [Maine Civil Rights Act]"); *Forbis v. City of Portland*, 270 F. Supp. 2d 57, 61 (D. Me. 2003) (citing *Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me.1994); *see also Fowles v. Stearns,* 886 F.Supp. 894, 899 n. 6 (D.Me.1995) (holding that dismissal of municipal liability claims under section 1983 disposed of Maine Civil Rights Act claims)). Nothing about the Complaint's allegations seems to distinguish it from this line of authority, and each of the four previous Counts I through IV appear to cite section 1983 as the basis for bringing the federal constitutional claims in those Counts. Dismissal of the federal Counts I through IV therefore results in dismissal of Counts V and VI under the Maine Constitution.

## CONCLUSION

For the foregoing reasons, Defendant City of Portland respectfully requests that this case be dismissed with prejudice for failure to state a claim; or in the alternative, dismissed without prejudice for lack of standing and ripeness.

Dated at Portland, Maine this 21st day of July, 2026.

NORMAN, HANSON & DETROY, LLC

*/s/ Russell B. Pierce, Jr.*
Russell B. Pierce, Jr., Esq.
Attorney for Defendant City of Portland

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
220 Middle Street
Portland, ME 04112-4600
(207) 774-7000
rpierce@nhdlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2026, I electronically filed this **DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Russell B. Pierce, Jr.*
Russell B. Pierce, Jr., Esq.
Attorney for Defendant City of Portland

Norman, Hanson & DeTroy, LLC
220 Middle Street, P.O. Box 4600

Portland, ME 04112-4600
(207) 774-7000
rpierce@nhdlaw.com